**WARNER BROS. THEATRES, Inc., v.**
**COOPER et al.**
**Civ. No. 2924.**

United States District Court,
W. D. Oklahoma.

June 16, 1950.

Keaton, Wells, Johnston & Lytle, Oklahoma City, Okl., Harold Berkowitz, New York City, for plaintiff.

Everest, McKenzie, Gibbens & Crawford, Oklahoma City, Okl., for defendants Cooper and Harbers.

Rainey, Flynn, Green & Anderson, Oklahoma City, Okl., for Standard Theatres.

VAUGHT, Chief Judge.

This cause was filed in the District Court of Oklahoma County, Oklahoma, and by proper proceedings removed to this court. The plaintiff seeks to impress a certain lease dated November 19, 1945, from J. N. Harber and Mary Harber to the Cooper Foundation covering the Liberty Theatre, in Oklahoma City, Oklahoma, and the leasehold estate created by the lease, with a constructive trust for the benefit of the plaintiff, and a further judgment that any claims of J. H. Cooper, the Cooper Foundation and Standard Theatres Corporation be held in trust, ordering and directing said parties to transfer said lease to the plaintiff as its property, and for injunctive relief, costs and such other relief to which it may be entitled.

The controversy grows out of the following transactions pertaining to the Liberty Theatre, in Oklahoma City, Oklahoma. On May 1, 1915, F. B. Zieglar and Nettie R. Zieglar, the owners of the property, executed a lease thereon to J. G. Street, H. W. McCall and W. M. Robertson. The interest of these lessees subsequently became the property of a corporation known as Mid-West Enterprise Company (hereinafter referred to as "Mid-West.") This lease contained the following provisions:

"To have and to hold, from the 1st day of July, 1915, to midnight of the 30th day of June, 1925, with an option to continue said lease for additional periods of five (5) years each, as hereinafter provided, not exceeding or running beyond midnight of June 30, 1945."

\* \* \* \* \* \*

"XXI. At the expiration of this lease, by limitation of time or failure to pay rent, or to perform the conditions hereof by the lessees agreed to be performed, the same shall terminate at once, \* \* \*." (Pltf. Ex. 1.)

On June 24, 1930, Mid-West entered into a sublease agreement with Warner Bros. Theatres, Inc., (hereinafter referred to as "Warner"), the plaintiff herein. The pertinent portions of that agreement are as follows:

"Article I. That the Lessor hereby subleases and sublets, and the Lessee hereby takes, subleases and hires from the Lessor the above described real estate, \* \* \* including the Liberty Theatre Building thereon, subject to all of the terms, covenants and provisions of the present and existing lease under which the Lessor is now occupying and using said premises for theatre purposes, for a term commencing at midnight on June 28, 1930 and ending at midnight on June 30, 1945, provided that if said major lease shall be terminated earlier by reason of any act of the Lessee herein, this sublease shall terminate coincident with the sooner termination of said major lease."

"Article XX. That notwithstanding any of the provisions herein contained this sublease shall in all respects be subject to all terms and provisions of the original lease of May 1, 1915, \* \* \*."

"Article XXI. \* \* \* The Lessor hereunder further covenants, represents and warrants that it will exercise its option to renew said major lease at the end of each five-year term thereof so as to have and hold the same until June 30, 1945, \* \* \*."

The ownership of the fee in the property changed and on June 8, 1940 was owned by J. N. Harber, who on that date entered into an agreement with Mid-West, extending the lease for a period of ten years. The agreement contains the following provisions:

"Whereas, according to the terms of said original lease the second party, lessee herein, has the right and option to renew said lease for an additional period of five years from June 30, 1940, and to and until June 30, 1945; and

"Whereas, said Mid-West Enterprise Company, lessee, has exercised said option in writing, by giving the notice provided for in said lease, and in addition thereto desires to retain said lease for an additional five (5) years, and to-wit, from July 1, 1945, to and until June 30, 1950, and has requested that said lease be extended and continued for an additional five (5) years beyond the expiration of the present lease so that the lease as thus extended by the exercise of said option and the granting of the additional time, will expire on June 30, 1950;

\* \* \* \* \* \*

"First. That in consideration of the payment of the cash rents hereinafter set out, and the performance of each and every condition of the original lease of May 1, 1915, the said lease is hereby extended from the said 1st day of July, 1940, to and until the 30th day of June, 1950, at midnight of said day, \* \* \*.

\* \* \* \* \* \*

"Said original lease shall remain in full force and effect and subject to all of the terms and conditions and agreements therein set out, and modified only by this agreement, to-wit, as to date of expiration and the payment of rentals as herein set out." (Pltf. Ex. 2.)

On October 16, 1940, Mid-West entered into an agreement to extend the sublease held by Warner to June 30, 1950. That contract contained the following:

"First:—The term of the above mentioned sublease is hereby extended for an additional period of five years commencing at midnight on June 30, 1945 and ending at midnight on June 30, 1950, \* \* \*.

\* \* \* \* \* \*

"Fifth:—That said sublease shall remain in full force and effect except only as

specifically modified by the terms of this agreement." (Pltf. Ex. 4.)

On September 1, 1933, Warner, Criterion Theatre Corporation (hereinafter referred to as "Criterion"), Regal Theatres, Inc. (hereinafter referred to as "Regal"), and J. H. Cooper entered into an agreement by the terms of which the theaters of the parties should be pooled and a corporation organized to manage, control and operate same. The pertinent portions of the agreement are as follows:

"Whereas, Warner leases, pursuant to six (6) certain leases (including in the terms 'lease' or 'leases' wherever used in this Agreement, a sub-lease or sub-leases) dated June 24, 1930, between Mid-West Enterprise Company and Warner, the following theatres, located in Oklahoma City, in the State of Oklahoma, and the respective terms of said Leases, none of which contain any option to extend or renew the original term thereof, expire on the dates set forth below:

```
*     *     *     *     *     *
Liberty             June 30, 1945
*     *     *     *     *     *
```

"Whereas, the parties desire that a new corporation be organized to manage, control and operate the above theatres, and that Mr. Cooper be elected President and employed as General Manager of the new corporation, and as such General Manager, have general charge and management of the affairs of the new corporation, upon the terms and conditions hereinafter set forth;

```
*     *     *     *     *     *
```

"1. The parties will promptly after the execution and delivery of this Agreement cause a corporation to be organized under the laws of the State of Delaware, with the name 'Standard Theatres Corporation', or such other name as may be determined, such new corporation being hereinafter referred to as the New Corporation. * * *

```
*     *     *     *     *     *
```

"3. The New Corporation shall manage, control and operate the theatres above mentioned, but the New Corporation shall have no authority, management, control or supervision over any portion of the property on or in which any of such theatres is located * * *.

```
*     *     *     *     *     *
```

"5. Upon the organization of the New Corporation, the parties hereto will use their best efforts to cause the New Corporation to enter into an employment contract in the form attached hereto, marked Exhibit B, and made a part hereof, between the New Corporation and Mr. Cooper, as General Manager, which shall provide, * * * that Mr. Cooper shall be employed as General Manager of the New Corporation and shall have general supervision and management of the affairs of the New Corporation * * *.

```
*     *     *     *     *     *
```

"7. This Agreement and the management agreement and the employment agreement * * * shall continue, subject to earlier termination as in this Agreement provided, in full force and effect to and including June 29, 1950; * * *." (Pltf. Ex. 29.)

Upon the same date, September 1, 1933, an agreement was entered into between Warner, Criterion and Regal, on the one hand, and Standard, on the other hand, which reads in part as follows:

"Whereas, by an Agreement dated as of September 1, 1933, between Warner, Criterion, Regal and J. H. Cooper, the parties thereto agreed, among other things, to cause the New Corporation to be organized to manage, control and operate said theatres upon the terms, conditions and provisions provided in said Agreement and this Agreement is entered into pursuant to the terms, conditions and provisions of said Agreement; and

"Whereas, the New Corporation is authorized by its Certificate of Incorporation to manage, control and operate theatres, and Warner, Criterion and Regal, respectively, desire that the New Corporation manage, control and operate the above theatres;

"Now Therefore, in consideration of the premises and the terms, provisions and conditions hereinafter set forth, it is mutually convenanted and agreed by and between the parties hereto as follows:

280

"1. Warner hereby engages and employs the New Corporation exclusively to manage, control and operate the following theatres: * * * Liberty Theatre * * * upon the terms and subject to the conditions hereinafter set forth. * * *

\* \* \* \* \* \*

"11. The employment of the New Corporation hereunder shall commence as of September 1, 1933, and, unless sooner terminated as herein provided, shall continue to and include June 29, 1950. * *

"12. It is not intended by this Agreement that the parties enter into any partnership or joint venture, the intention being solely that the New Corporation shall be employed as an independent contractor to manage, control and operate such theatres. Neither Warner, Criterion nor Regal assumes, or agrees to be responsible for, any obligations, contracts or agreements incurred or entered into by the New Corporation in connection with the performance by the New Corporation of its obligations hereunder." (Pltf. Ex. 33.)

The above excerpts from the various agreements pertaining to the original lease of the Liberty Theatre and the sublease of Warner are set out in order to show the full picture as it pertains to this controversy. On June 24, 1930 Mid-West owned the original lease on the Liberty which lease extended to June 30, 1924, with an option to renew for five-year periods "not exceeding or running beyond midnight of June 30, 1945." The language is plain and positive that there was no agreement as to renewal after June 30, 1945. The sublease of Warner provided that it was subject to the terms of the original lease "under which the lessor (original lessee) is now occupying and using said premises for theatre purposes, for a term commencing at midnight on June 28, 1930 and ending at midnight on June 30, 1945." It is therefore clear that all parties understood that in any event by the provisions of the original lease neither the lessee nor the sublessee could have any property right within the terms of the original lease, in an expectancy of a renewal of the lease after that date as the matter stood on June 24, 1930.

The fee to the property impressed with the original lease had changed to J. N. Harber when the notice was given that the last option was to be exercised by Mid-West, and on June 8, 1940 the new owner entered into an agreement to extend the term of the lease for a period of five years from July 1, 1945 to June 30, 1950. This agreement provided that the five-year option should be accepted from June 30, 1940 and to and until June 30, 1945," and then uses this language: "Whereas, said Mid-West Enterprise Company, lessee, has exercised said option * * * and in addition thereto desires to retain said lease for an additional five (5) years, and to-wit, from July 1, 1945, to and until June 30, 1950, and has requested that said lease be extended and continued for an additional five (5) years beyond the expiration of the present lease so that the lease as thus extended by the exercise of said option and the granting of the additional time, will expire on June 30, 1950." There was no provision for any option to renew or for any further extension. The lease further provided "said original lease shall remain in full force and effect and subject to all of the terms and conditions and agreements therein set out, and modified only by this agreement, to-wit, as to date of expiration and the payment of rentals as herein set out."

Then on October 16, 1940 Warner procured a new agreement from Mid-West subleasing the Liberty to cover the period from June 30, 1945 to June 30, 1950, reciting in the contract that it resulted from the exercise of the option of Mid-West and the procurement of an extension of the original lease to June 30, 1950, under the contract of June 8, 1940 between Harber and Mid-West. Here, too, the language employed as to the date of the expiration of the lease and sublease is specific: "The parties hereto desire to extend the term of said sublease for an additional period of five years commencing at midnight June 30, 1945 and ending at midnight June 30, 1950." If the sublessee had any expectancy in a renewal of the sublease, it would have to depend upon the original lessee's right of renewal of the original lease. Under the

language the parties employed in both the extension of the lease in the contract of June 8, 1940 and the sublease on October 16, 1940, there is no room to speculate on what was in the minds of the parties, and they are bound by the plain language used in their written agreements. Neither Mid-West nor Warner had any property right, either actual or implied, to a renewal of their lease or sublease after midnight of June 30, 1950, as a matter of law or equity, unless other circumstances had entered into the situation which would grant such a right.

The plaintiff contends that there is a question of agency involved, and that by a preponderance of the evidence it is shown that the lease between J. N. and Mary Harber and the Cooper Foundation, under date of November 19, 1945, was in reality a lease to J. H. Cooper, who it is contended was one and the same as the Cooper Foundation; that the Cooper Foundation lease should be construed to be a lease for and on behalf of Warner; that the Cooper Foundation lease should be held to be impressed with a trust in favor of Warner; and, that the Cooper Foundation should be compelled to assign the lease to Warner. This, by virtue of the course of dealings between the parties which resulted in a property right of Warner, plaintiff herein, of an "expectancy in a renewal of its sublease on the Liberty;" all by virtue of the contention that J. H. Cooper was the agent of Warner, throughout their course of dealings.

The Cooper Foundation was incorporated under the laws of the State of Nebraska on December 14, 1934, for a period of fifty years, with its principal office in Lincoln, Nebraska. The purposes of the corporation and its manner of administration are set out in its original charter as follows:

"III. The object for which this corporation is organized is for the purpose of maintaining funds secured by bequests, gifts, donations, or otherwise, for such charitable purposes as may be designated by a majority of its Board of Trustees, which purposes may include research, investigation, and experimentation with a view to ascertaining charitable needs of persons resident in the United States, with particular reference to persons resident of Lancaster County, Nebraska.

"IV. Its affairs shall be conducted by trustees who shall be not less than three, nor more than twelve, each of whom shall hold office for one year or until his successor is elected and qualified. Vacancies in the Board of Trustees created by resignation, death, or otherwise, shall be filled by the trustees themselves at any meeting. The annual meeting of the corporation shall be held on the first day of January of each year.

"V. No person shall be a member of this foundation unless: A. He is a trustee, B. Or unless he is elected a member by majority vote of the trustees. No member shall have any right to vote for, remove or dictate the action of the duly constituted trustees.

\* \* \* \* \* \*

"VII. This corporation may own, hold, manage, and control real estate under the provisions of the laws of Nebraska, and may invest its funds in any securities approved by a majority of its trustees."

On December 12, 1942, after eight years of experience in the operation of the corporation, the charter was amended as follows:

"Resolved, That paragraph II of the Articles of Association be amended by striking out the words, 'be incorporated for a period of fifty years from the date of the filing of these articles,' and substitute therefor the following, 'have perpetual existence.'

"That paragraph III be amended by adding thereto the following: 'For the purposes above specified and any other charitable purpose, or to obtain funds or income for charitable purposes, it may contract for, purchase, receive, manage, hold and dispose of real, personal and mixed property, wheresoever situated, by gift, grant, devise, bequest or purchase and may operate said properties or any part thereof, or any business it may acquire in any location, in the name of the corporation, or in any other manner and for its benefit and in its behalf through such persons or agents as it may designate or select from

time to time by majority action of the Trustees, but without any person by reason of membership or position as Trustee or officer of said association becoming entitled thereby to any special dividend or benefit out of the funds thereof, depending on such membership.' "

These provisions give a clear picture of the purposes of the corporation, the powers and duties of the trustees, and the manner in which its affairs were to be administered. J. H. Cooper was a shrewd and competent business man, who accumulated large sums of money and was charitably inclined. It is true that the evidence also discloses that most of the gifts and donations to the Foundation were directly from, or through the efforts of, J. H. Cooper, and that from time to time he would make suggestions as to how the funds were to be administered, even entering into contracts with the corporation on some of the enterprises conducted in its behalf. This was a natural thing for a donor to do, and does not indicate a desire on his part to control the affairs of the corporation. A careful reading of the Minutes of this corporation (Pltf. Ex. 6) discloses nothing that indicates J. H. Cooper dominated its affairs. Trustees were duly elected who had charge of the business of the corporation, some of whom testified in this case. The court was favorably impressed with their apparent high standing as business and professional men in their community. The corporation made investments in properties and many substantial donations to charitable purposes. From a rather modest start it grew into a large enterprise and holds such a position at this time. The balance sheet of the Foundation shows assets of $3,173,507.50 (Pltf. Ex. 41). The Minutes of the corporation discloses the character of the work in which it engages. For instance, on December 12, 1942 donations were made to Boys Town, hospitals, charitable institutions and other worthy objects of relief, in the total sum of $10,300; on December 13, 1943 donations were made to the University of Oklahoma, hospitals, charitable institutions, Greek Relief, Oklahoma City Ice and Milk Fund, Father Flanagan's Home for Boys, and other worthy institutions in the total sum of $11,413.08; and on March 23, 1944 donations were made to the University of Nebraska Foundation, charitable institutions, hospitals, Boy Scouts, Deserving Students' Fund, and other worthy institutions in the total sum of $30,208.50. There is scarcely a meeting that does not disclose this benevolent work.

The court finds nothing in the evidence to conclude that the corporation was controlled in the conduct of its business by J. H. Cooper to the exclusion of its Board of Trustees, but finds it was controlled and operated by its Board.

The plaintiff vigorously contends that the evidence conclusively proves that J. H. Cooper and the Cooper Foundation are one and the same. A careful analysis of the record does not support the plaintiff in that conclusion. The court finds that the Cooper Foundation is not the "alter ego" of J. H. Cooper.

The defendants contend that the pooling contracts of September 1, 1933, are invalid and by reason thereof, the plaintiff is not entitled to the relief sought, or any other relief. In view of the holding that the Cooper Foundation is not the alter ego of J. H. Cooper, the court deems it wholly unnecessary to pass on that phase of the situation.

The agreements between Warner, Criterion, Regal and J. H. Cooper, dated September 1, 1933, and Warner, Criterion, Regal and Standard, dated September 1, 1933, and the transactions of these parties subsequent thereto, present a very unusual situation. These parties, on that date, concluded to pool their theater operations. Each party to the arrangement carefully set out in the contract the theaters to be involved, the date of the leases on each theater, and the expiration date of each lease. From September 1, 1933, the date of the expiration of the lease on the Liberty Theatre, in Oklahoma City, was more or less public information, made so by the parties to the contracts. The pooling contract provided that a new corporation was to be organized "to manage, control and operate" all of the theaters involved for a definite period; that Mr. Cooper be elected presi-

dent of the new corporation and employed as general manager to have general charge and management of the new corporation under the terms and conditions set forth in detail therein, and that upon the organization of the new corporation, a contract would be entered into promptly between the parties and the new corporation to manage, control and operate the theaters. Then a contract between the new corporation and the parties, for operation of the theaters, was entered into on the same date, September 1, 1933, by the terms of which the new corporation was employed by the parties, including the plaintiff, "exclusively to manage, control and operate" the theaters involved, "upon the terms and subject to the conditions" thereinafter set forth. The word "exclusively" is quite comprehensive and apparently was used by the parties advisedly, for paragraph 12 of said Standard contract stated:

"It is not intended by this Agreement that the parties enter into any partnership or joint venture, the intention being solely that the New Corporation shall be employed as an independent contractor to manage, control and operate such theatres. Neither Warner, Criterion nor Regal assumes, or agrees to be responsible for, any obligations, contracts or agreements incurred or entered into by the New Corporation in connection with the performance by the New Corporation of its obligations hereunder."

It is apparent that their concern as to Cooper was to have someone in the organization who was a capable theater operator, that Standard avail itself of his ability, and that he be responsible only to Standard and not to the plaintiff or its associates under the Standard contract.

The plaintiff never at any time during the entire period held a lease from the owner of the fee on the Liberty Theatre for any term, nor had an assignment of such a lease. All it had was a sublease from Mid-West, who held under a lease from the owner of the fee. If the plaintiff has any claim, it must look to Mid-West and not to the owner of the fee interest.

Having come to these conclusions, the argument and authorities cited by the plaintiff must fall. We have no quarrel with the law thus presented, but under the facts those authorities do not apply.

The court is of the opinion that the plaintiff has not established its cause of action by that degree of evidence essential in this character of case, and is therefore not entitled to the relief sought.

Findings of fact and conclusions of law, together with a form of judgment, consistent with this opinion, may be submitted within fifteen days from this date.